UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD L. SALVI and <br> HENRY P. SERAFINI, <br><br> Plaintiffs, <br><br> v. <br><br> TRW AUTOMOTIVE U.S. LLC, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) Civil Action No. <br> ) 11-40085-FDS <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION TO COMPEL ARBITRATION
AND FOR DISMISSAL AFTER REFERRAL TO ARBITRATION**

**SAYLOR, J.**

This is an action alleging discrimination based on disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and Massachusetts General Laws Chapter 151B. Plaintiffs Richard L. Salvi and Henry P. Serafini contend that their employer, defendant TRW Automotive U.S. LLC, constructively terminated them by failing to accommodate their disabilities.

The issue before the Court is whether this dispute is subject to arbitration. Defendant has moved to compel arbitration and to dismiss or stay the litigation. Defendant contends that plaintiffs signed an agreement requiring that disputes such as this be submitted to arbitration before seeking a judicial remedy. For the reasons stated below, the Court agrees that this matter is subject to that agreement and should be arbitrated. Accordingly, defendant's motion to compel arbitration will be granted and the litigation will be stayed until the conclusion of the arbitration.

I.      **Factual Background**

TRW is an automobile parts manufacturer that maintains a facility in Westminster, Massachusetts. (Compl. ¶¶ 5, 9). Salvi began working for TRW in October 1970; Serafini began in May 1986. (*Id.* ¶¶ 10-11). Both worked as tool makers in the Westminster facility. (*Id.* ¶¶ 10-12). For many years, both Salvi and Serafini worked a daytime shift. Their normal work hours were from 6:00 a.m. until 2:30 p.m., five days per week, with occasional work on a Saturday or Sunday morning shift. (*Id.* at ¶ 14).

Salvi and Serafini both suffered from heart conditions that required regular medical treatment and that placed substantial limitations on their activities. (*Id.* ¶ 18-19). Notwithstanding these limitations, both were able to work an eight-hour shift. (*Id.*). TRW was aware of their medical conditions. (*Id.* ¶¶ 20-21).

Shortly before June 2010, and in response to economic pressures, TRW developed a "Get Well Plan" to reduce costs. (*Id.* ¶ 22). Among other things, the Get Well Plan replaced the existing system of eight-hour shifts five days per week with a system of twelve-hour shifts three to four days per week. (*Id.*).[1] The company held a meeting on June 18, 2010, where representatives explained that the Get Well Plan would be implemented effective July 12, 2010. Company representatives also provided an informational handout to the employees. (*Id.* ¶¶ 24-25). The handout stated that if an employee could not work the schedule to which he was assigned, he could submit a form called "Team/Shift Change Request" to the human resources department. It

---

[1] Specifically, the Get Well Plan divided employees at the Westminster facility into teams. (*Id.* ¶ 22). Each team would work alternating twelve-hour shifts (either from 7:00 p.m. to 7:00 a.m., or from 7:00 a.m. to 7:00 p.m.) in a two-week rotation. (*Id.*). This consisted of working 48 hours during the first week and 36 hours during the second week. (*Id.*).

also stated that "[i]f you cannot arrange your lifestyle to fit this schedule, you will have to resign your position." (Pl. Ex. B; Compl. ¶ 25).

Shortly after the June 18 meeting, Salvi and Serafini each separately told their supervisors that their medical conditions prevented them from working the twelve-hour shifts. They requested accommodations from TRW—specifically, that they continue working their eight-hour shifts. (Compl. ¶¶ 29-33). They also each submitted the "Team/Shift Change Request" form referred to the handout provided at the June 18 meeting. Their requests, however, were denied. (*Id.* ¶ 34-35). Believing their only remaining option was to resign, Salvi and Serafini each submitted a handwritten note to TRW on June 28, 2010, giving their two-weeks' notice and explaining they were unable to work a twelve-hour shift due to medical reasons. (*Id.* 39-41; Pl. Ex. E, G). Their last day of work at TRW was July 9, 2010. (*Id.* ¶ 52).

### A.     TRW's Dispute Resolution Policy

In 2002, TRW instituted a "Problem Resolution Policy" (the "Policy"). (*See* Longe Aff. Ex. A). The Policy is binding on both TRW and its employees, and establishes procedures for the resolution of employment disputes. The Policy states on its first page that "[t]his policy must be used before an employee can pursue resolution of a covered dispute through the court system." It goes on to state that an employee's dispute resolution options under the Policy include "the use of the local problem solving process, Peer Review Process, and the Alternative Dispute Resolution ("ADR") Process, which includes mediation and arbitration." (*Id.*, at 1).

In several places, the Policy states that an employee can choose from the different available problem-solving processes. (*See id.* at 2-3, 9). For example, if an employee does not want to resolve a dispute through the peer-review process, he or she "may instead choose to use

the local problem solving procedure (open door policy), or ADR (if a covered dispute)." (*Id.* at 2). Similarly, an employee can reject a manager's decision made using the local problem-solving process and request ADR, if it is a covered dispute. (*Id.* at 2).

Under the Policy, only certain disputes can be resolved through the ADR process. Among those disputes are "[c]laims of discrimination, harassment or retaliation based on protected status." (Ex. A, at 9). If an employee chooses to use the ADR process, he must first try to resolve the dispute through mediation. (*Id.* at 11). If the mediation fails (or if the parties agree there is no possibility that mediation will resolve the dispute), then the employee may proceed to arbitration. (*Id.* at 11-12). The Policy states that "[t]he final step in the . . . Problem Resolution Policy is arbitration," and that "[a]rbitration must be used before the employee can pursue such claims through the court system against TRW Automotive or its employees." (*Id.* at 11-12). If an employee is not satisfied with the results of arbitration, he can pursue his claim in an "external forum," in which case the arbitration decision will not be binding on TRW. (*Id.* at 16-17).

Salvi and Serafini each signed an "Employee Certification Form" on October 9, 2002. (Longe Aff. Ex. B, C; Salvi. Aff. ¶ 3; Serafini Aff. ¶ 3). The form states the following:

> By signing below, I confirm that I received the TRW Automotive Problem Resolution Policy effective October 1, 2002. The Policy has been reviewed with me, I have had the opportunity to ask questions about it, and I understand the processes I must use to resolve disputes.

(Longe Aff. Ex. B, C). Salvi and Serafini allege that they do not remember signing the Certification Form, but do not dispute that they did. (Salvi. Aff. ¶ 3; Serafini Aff. ¶ 3). They also do not remember anyone explaining to them that the Policy would require them to arbitrate their claims before seeking a judicial remedy. (Salvi. Aff. ¶ 4; Serafini Aff. ¶ 4).

## II.     Procedural History

Plaintiffs instituted the present action against TRW on April 27, 2011, alleging constructive termination and failure to accommodate under the Americans with Disabilities Act and Mass. Gen. Laws 151B. Defendants have moved to compel arbitration and for dismissal after referral to arbitration, or, in the alternative, to stay litigation pending the conclusion of arbitration.

## III.    Legal Standard

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, governs the enforcement of written arbitration agreements, including agreements in most employment contracts. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001) (holding that the FAA extends to employment cases for employees other than those engaged in transportation). It was enacted in order to reverse longstanding judicial hostility to arbitration agreements and to "place such agreements upon the same footing as other contracts." *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 271 (1995) (citation and internal quotation omitted).[2] The act promotes "a liberal federal policy favoring arbitration agreements . . . . [and] any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

"A party who is seeking to compel arbitration must demonstrate 'that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is

---

[2] The FAA states, in relevant part, as follows:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

bound by that clause, and that the claim asserted comes within the clause's scope.'" *Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino*, 640 F.3d 471, 474 (1st Cir. 2011). "When an enforceable arbitration agreement exists between the parties, a court may enforce that agreement by staying existing litigation pending arbitration of the parties, 9 U.S.C. § 3, or compelling the parties to arbitrate, 9 U.S.C. § 4." *DeLuca v. Bear Stearns & Co.*, 175 F. Supp. 2d 102, 106-07 (D. Mass. 2001).

When a party relies on the FAA to assert a contractual obligation to arbitrate a claim arising under the ADA, the court "must undertake a supplemental inquiry." *Campbell v. Gen. Dynamics Gov't Sys. Corp.*, 407 F.3d 546, 552 (1st Cir. 2005). The ADA provides that "[w]here appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including . . . arbitration, is encouraged to resolve disputes arising under this Act." 42 U.S.C. § 12212. Therefore, a party "can prevail on its demand for arbitration [of a discrimination claim] only if it can establish that the provision for mandatory arbitration is part of a valid contract within the purview of the FAA and [the] court finds that the enforcement of the arbitration provision would be appropriate under the ADA." *Campbell*, 407 F.3d at 554-55; *see also Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1, 18-19 (1st Cir. 1999).

IV. <u>Analysis</u>

    A. <u>The Arbitration Clause</u>

The parties agree that the arbitration clause in the Policy was part of a validly executed contract within the purview of the FAA. However, plaintiffs contend that enforcing such a clause in these circumstances would not be "appropriate" under the ADA. "The appropriateness of enforcing an agreement to arbitrate an ADA claim hinges on whether, under the totality of the

circumstances, the employer's communications to its employees afforded 'some minimal level of notice' sufficient to apprise those employees that continued employment would effect a waiver of the right to pursue the claim in a judicial forum." *Campbell*, 407 F.3d at 555.  Often, "an employer will be able to satisfy this relatively light burden by producing evidence demonstrating that the employee had actual notice of the agreement." *Id.*; *see also Ellerbee v. Gamestop, Inc.*, 604 F. Supp. 2d 349, 354-355 (D. Mass. 2009).  Whether the notice is sufficient is judged by an objective standard, evaluating "whether, under the totality of the circumstances, the employer's communication would have provided a reasonably prudent employee notice of the waiver." *Campbell*, 407 F.3d at 555.  Relevant factors include "the method of communication, the workplace context, and the content of the communication." *Id.*

Plaintiffs contend that defendant failed to provide appropriate notification that they were required to arbitrate their claims before seeking a judicial remedy.  Specifically, plaintiffs argue that the language of the Policy was ambiguous such that a reasonable person could read it and conclude that the Policy presented an optional alternative to litigation, and that defendant did not otherwise explain that the Policy required them to arbitrate claims before proceeding to court.[3]

However, plaintiffs' argument is contradicted by the plain language of the Policy.  The first page of the Policy states that "[t]his policy must be used before an employee can pursue

---

[3] Plaintiffs also cite *Warfield v. Beth Israel Deaconess Med. Ctr., Inc.*, 454 Mass. 390, 398 (2009), for the proposition that an arbitration requirement must be set out in clear and unmistakable terms.  The *Warfield* court held that Massachusetts law requires that "an employment contract containing an agreement by the employee to limit or waive any of the rights or remedies conferred by [Mass. Gen. Laws ch.] 151B is enforceable only if such an agreement is stated in clear and unmistakable terms." *Id.*  However, "[t]he sole issue in *Warfield* was whether the employee and employer had specifically agreed to arbitrate claims of discrimination within the scope of protection afforded by [Mass. Gen. Laws ch.] 151B when they included a *general arbitration clause* in their employment agreement." *Joule, Inc. v. Simmons*, 459 Mass. 88, 95 n.9 (2011) (emphasis added).  Here, the ADR provisions of the Policy do not contain a general arbitration clause, but specifically list the types of claims subject to arbitration, including "[c]laims of discrimination . . . based on protected status." (Longe Aff. Ex. A, at 9).

resolution of a covered dispute through the court system." (Longe Aff. Ex. A, at 1).  The Policy then describes the various dispute resolution methods available to employees under the Policy, such as ADR (which includes arbitration).  (*Id.*).  It explicitly states the ADR process covers "[c]laims of discrimination . . . based on protected status," (*id.* at 9), and that "[a]rbitration must be used before an employee can pursue such claims through the court system . . . ."  (*Id.* at 12).  Such language provides adequate notice that plaintiffs were "agreeing to arbitrate statutory employment discrimination claims."  *Soto-Fonalledas*, 640 F.3d at 478; *see also Campbell*, 407 F.3d at 557 ("One fundamental flaw is that the e-mail did not state directly that the Policy contained an arbitration agreement that was meant to effect a waiver of an employee's right to access a judicial forum."); *Rosenberg*, 170 F.3d at 18 (explaining that had the document containing the arbitration clause "given explicit notice that employment disputes were subject to arbitration, we would have had little difficulty in finding that [plaintiff] had agreed to arbitrate her employment discrimination claims").[4]

For the arbitration agreement to be binding, defendant is not required to show that plaintiffs actually understood their obligations under the Policy, only that they gave plaintiffs "the information sufficient to put a reasonably prudent employee on adequate notice of the agreement

---

[4] In support of their argument, plaintiffs quote language from the Policy that purportedly suggests that an employee's use of ADR and arbitration is optional.  (*See* Pl. Mem., at 3-4).  However, when read in context, the language cited by plaintiffs does not indicate that arbitration could be used as an *alternative* to pursuing a claim in court.  Rather, those provisions unambiguously provide that employees have the option of using ADR if they want to contest the results of (or do not want to pursue) the other dispute-resolution methods provided in the Policy.  (*See* Longe Aff. Ex. A, at 1-2, 9, 12).  This is made even more clear when the Policy explains that arbitration is "[t]he final step in the . . . Problem Resolution Policy."  (*Id.* at 11).  Of course, the Policy does not *force* an employee to use arbitration—he or she can accept the resolution of their claim reached through any other method described in the Policy—but, the Policy expressly requires that employees use arbitration before pursuing their claims in court.  (*Id.* at 12; *see also id.* at 16-17).

to arbitrate." *Ellerbee*, 604 F. Supp. 2d at 355. Here, defendants clearly met that standard. Plaintiffs received a copy of the Policy and signed a form certifying that they reviewed the Policy, had an opportunity to ask questions about it, and understood how they were required to resolve disputes. *Cf. Campbell*, 407 F.3d at 557-558 (explaining defendant's notice was flawed in part because it "did not state either that the Policy contained contractually binding terms or that the employer would treat continued employment as an acceptance of those terms"). The fact that plaintiffs cannot remember signing the certification or reading the Policy does not "rebut defendant['s] overwhelming evidence that [they] did, in fact, have actual knowledge of the Policy and its terms." *Boateng v. General Dynamics Corp.*, 473 F. Supp. 2d 241, 249 (D. Mass. 2007).

Accordingly, the Court finds that enforcement of the arbitration requirement would be "appropriate" within the meaning of the ADA.

### B.    Proper Disposition of the Case

Having determined that the arbitration provision is enforceable, the Court must now determine the proper disposition of this case. Defendants urges dismissal in favor of arbitration. Such a resolution, however, is unnecessary and potentially unfair. Among other things, the Policy contemplates that plaintiffs may seek a judicial remedy following arbitration, and it is possible that the applicable limitations period on plaintiffs' claims might expire during arbitration. The Court will therefore stay the proceedings pending arbitration.

## IV.    Conclusion

For the foregoing reasons, defendant's motion to compel arbitration is GRANTED. This matter is referred to binding arbitration in accordance with the Problem Resolution Policy to which plaintiffs agreed on October 9, 2002. The litigation is hereby stayed pending arbitration.

**So Ordered.**

                                                          /s/ F. Dennis Saylor_____  
                                                          F. Dennis Saylor IV  
                                                          United States District Judge

Dated:  January 30, 2012